110-2968 Pactiv Corporation v. Mosey v. Pactiv Counsel, you may proceed. Thank you, Your Honors. Mr. Cohn. May it please the Court. My name is Marty Spiegel and I represent the employer Pactiv. This is our appeal of the Commission's decision which reversed arbitrator Cain, who found that the petitioner failed to prove that he sustained a compensable injury, that he failed to give timely notice, and that he failed to prove his condition was causally related to his employment. The arbitrator in reaching that decision found Mr. Sanchez lacking in credibility and unworthy of belief. On review, the Commission, in reversing arbitrator Cain, found that he sustained a cumulative trauma to the right shoulder, which manifested itself on April 29, 2003, and that the job duties setting up the dice contributed to his right shoulder condition. They also found that he gave timely notice when he gave a note with his restrictions from Dr. Collins on April 29, 2003. A petitioner has the burden of proving all of the elements of his case by a preponderance of credible evidence, which in this case we're arguing would be more likely than not. And that will become apparent with the next issue that I'd like to discuss, and that's what did Dr. Collins, the treating doctor, testify to? When he was asked within a reasonable degree of medical certainty whether the job caused or contributed to the condition, he had several responses over the course of the questioning. One, and that is where I guess it depends, it might have contributed or caused him to have a surgery. The second one was the work might have, you know, contributed. Third one was I can't say that the work necessarily caused it with any certainty. I think one that's very important is I don't think I can state with a reasonable degree of medical certainty that a patient has a rotator cuff tear as a result of cumulative or repetitive use of the arm over the years. Was the case really the standard fall on Dr. Collins' testimony? Isn't there some evidence of the MRI showing a changing condition from some impingement to a full tear of the tendon? Isn't there some medical evidence involved there? There was an MRI done in 1997 which may or may not have showed a small partial tear of the undersurface of the rotator cuff. But Dr. Collins also testified during the course of his testimony that he can't tell when the rotator cuff started. He also said it is more likely than not that Mr. Sanchez would have needed the surgery irrespective of his work duties. And as I indicated, there's no way to tell when the rotator cuff developed. So basically what we have here is a doctor saying it might have contributed. I can't say that it necessarily caused it with any certainty. It contributed to what eventually happened. I don't think this rises to where we're the standard of a preponderance of credible evidence, meaning that work was more likely than not a causative factor in either the cause of the injury or the aggravation of the condition. Turning next to the issue of notice, there's no doubt in this situation that the manifestation date was April 29, 2003. Section 6C of the Workers' Compensation Act requires that notice of the accident be given within 45 days after the accident, as soon as practical but not later than 45 days. This Court, in white, has indicated that it's not enough that the employer knew of an injury. They must be notified that it's an industrial accident. Prejudice isn't relevant unless notice is timely but defective. So why wasn't the notice arguably, why wouldn't the rule apply here? There was a note given. You can argue it was inaccurate, it was defective, but some notice was arguably given. So how were you prejudiced? There was, I don't believe the prejudice inquiry comes into play, Your Honor, because the note that was given to Candy Wensen, the nurse at the plant, only contained his restrictions. Those restrictions were the same restrictions he had in 2000, 2001, and 2002. They were the same restrictions he had after his previous injury, which was hurt at the commission, in which he was granted an award. There would be no reason for my client to necessarily make an inquiry as to what the cause of those restrictions were. They could have naturally assumed that they emanated from the 1997 claim. That's a curious observation there because those restrictions, was he actually working for the employer within those restrictions? That's a bone of contention during the course of the trial. He says he was for three or four months after he came back to work from the prior injury, but that after that he returned to his regular work. Mr. Sanchez's testimony was all over the place. I had help when I needed help, but I had to lift things. It's not real clear what he did and what he didn't do. But, yeah, the testimony, he did definitely say that after three to four months, and the commission agreed with him, that he was back to doing his regular job. Is it not a reasonable inference that the employer was aware that he was not operating within his restrictions for that period of time? I believe that is a reasonable inference that you could draw, but I don't believe that's reasonable inference or notice, or you could draw that reasonable inference as it applies to the notice issue in this case. Well, is it unreasonable for the employer, when receiving new notice of restrictions, to be on notice that there must be something that has changed? Not really, Judge, because it still is the same restrictions he had ever since the 1997 claim. Now, admittedly, he says he wasn't working within those restrictions. My client was represented by Ruby Presley, a press supervisor, who had worked her way up from doing all the jobs that Mr. Sanchez did, who testified there wasn't really any heavy lifting involved in that job, and she's worked there for 42 years and knew every job at that plant inside and out, and that there was really no heavy lifting in that job. And with the confusion created by Mr. Sanchez's testimony, contrary to counsel's brief where he accuses me of causing the confusion during the trial, I don't think he can give a lot of credence to what Mr. Sanchez said. And I don't think just giving that notice, a note saying that someone has restrictions, is enough. I don't think that's consistent with your testimony. Did he also testify that he verbally said it's work-related? He testified, well. I mean, is there in the record testimony by him that he told them, the employer, that it was work-related? He testified that he told the employer in 2005 that it was work-related, Your Honor. In 2003, at page 93 of the arbitration transcript, when the arbitrator refocused him back to 2003, he said he gave the note to Candy Winson, and I asked him, you didn't tell Candy anything about your condition and whether you believe it was related to work, did you? He said, no, I didn't tell nothing, I just gave it to her. You didn't tell Randy, your supervisor, either? No, Randy wasn't there. That's the testimony as it pertains to 2003. The commission found, and the petitioner's attorney conceded on review, that there wasn't an accident in 2005. I don't think, we've already discussed the issue about the regional inferences, but I don't believe that you can draw these inferences that there was a new accident just because he has restrictions. There is no credible evidence, in my opinion, that he advised them that he had an industrial incident or believed that his condition was related to an industrial incident. We believe that he failed to give timely notice as required by Section 16, and the decision is against the manifest weight of the evidence. Finally, in keeping in mind that the arbitrator found Mr. Sanchez to be less than credible and unworthy of belief, I'm bringing up an argument that counsel for appellant in the first case made. In the Artie Thiel case, when the commission doesn't make a, reverses the arbitrator on a determination of credibility, its decision may be lacking in findings which make meaningful judicial review possible, and the remedy in that situation is to remand the matter back to the commission with directions to make the necessary filing. I have read this decision. I've reread the decision. They don't say anything about his credibility. They just flat out reverse the arbitrator on all issues, never mention his credibility during the course of their decision. While at the very least we think you should remand this case to the commission with directions to make the necessary findings on why they reversed on credibility, we respectfully request that this court enter in order, reversing the decision of the commission as being against the manifest weight of the evidence. Thank you. Thank you, counsel. Counsel, you may proceed. May it please the court and Mr. Spiegel. I'm Charles Cohn on behalf of the petitioner appellee here, Jose Sanchez. As the Respondent is well aware, the standard review here is whether the decision of the commission, without any difference to the decision of the arbitrator, is against the manifest weight of the evidence. I think it's overwhelmingly clear based on the very long and well-reasoned decision of the commission that it is not. Why did they believe him when the arbitrator didn't? Excuse me? Why did they believe him when the arbitrator didn't? I believe they believed him because in reviewing the testimony, they felt that he was corroborated by what he told his treating doctors throughout with regard to the essential issues of this case. As I said, he was corroborated by what was in the notes of Dr. Collins, who was a principal treater and I think other providers as well, that when he talked about doing overhead work, he was doing overhead work and it's reflected in there. And also the commission was very cognizant of the fact that apparently it appeared repeatedly in Dr. Collins' notes that he should change his work lifestyle. In other words, stop doing this overhead stuff that is aggravating his shoulder. And that's why I think they believed him is because he was corroborated by what he told his doctors. It wasn't just that he was fuzzy or if he was fuzzy. I don't know. They apparently didn't perceive him that way. But the essential thing was, and I believe it's so stated by the commission, was that he was corroborated in what he told his providers. So it wasn't just him standing alone. Also, there's nothing coming back the other way contradicting what Mr. Sanchez had to say. The only person they tried in, in the way of a person to contradict him, is a supervisor he didn't have until 2005 when, by his own admission, he was not doing the overhead work anymore. This lady was not his supervisor in 2003 when he returned to Dr. Collins. And they can't even explain why they didn't bring in his actual supervisor in 2003. For the first time in the reply brief, they say we don't, we, he mentions a supervisor he gave notice of note to in addition to Candy once in the New York City. He gave a note to a supervisor named Randy. The first time we ever hear in the record of this case, in the appellate court, the trial court, the commission, before the arbitrator, that they now say they don't know of anybody named Randy on their payroll, well, what is now, I think, in the reply brief. Well, that's a nice big so what? Because whether the guy's name was Randy or not, they had to know who his actual supervisor was in 2003. Well, setting aside the identity of the supervisor, he makes the argument that there wasn't proper notice, that there's a note that talks about a change or modification of work restrictions that doesn't specify there's an accident involved. What do you make of that argument? First of all, as the court said in questioning, he was evidence to indicate he returned to his previous duties and that any previous restrictions were not observed. So this note should have put them on some degree of notice. Second of all, he did say, based on the testimony of page 93 and 94 of the commission record, and I don't recall what that translates to in the appellate record, that he did say it was a work-related, that it was work-related when he gave the note. It's already testified he said that. He testified. Thank you. Thank you. Thank you. Thank you. Thank you. This tear never existed before. Now, there, Mr. Spiegel told you, and that's probably based on what Dr. Carroll said, that there was a small tear in 1997 in Santa Mara. Well, I don't think so. He speculated when a small tear might have existed. But his testimony, his deposition, there might have been a little bit of a partial thickness tear of the undersurface of the rotator cuff, but we didn't really see any real evidence for that tear. And so it was more specific for what we discussed earlier as a Stage II impingement. So there really was no clear evidence. And even if there was a small tear, which is more based on Dr. Collins' speculation, there wasn't anything approaching the large tear which was seen in July of 2003. So we have a major new event which coincided with additional pain that Dr. Collins is noting in 2003 of problems, I guess, with catching and other problems noted in the shoulder in 2003 that he had not noticed before. And as we also noted, the connection, the fact that this new event was work-related, as noted by the Commission, by the repeated references by Dr. Collins in his notes, that he should modify his work activities, modify your work activities. And that didn't happen. And also the testimony and the notes or report of Dr. Collins clearly indicated that whether or not, even though he, as he himself acknowledged, it was contradictory. He says, although it sounds contradictory, I think it more likely than not, had Mr. Sanchez been able to follow my restrictions, he more likely than not would not have ended up having surgery on the right shoulder in 2005. And he also stated, and I believe this is his deposition, I do believe the rotator cuff tear is more likely than not related to cumulative stresses of overhead activities and labor through the years, but I do not think I could relate it to anyone's particular injury. Well, that's typical of a repetitive motion thing. It's not going to be one event that caused it, but the repetitive stresses of the overhead work that he was doing over the years. And clearly this is a new injury that took place since this 2001 surgery from his previous injury, and a new, that took place, this tear developed sometime after the 2001 surgery and before, or he came back to Dr. Collins in 2003. It's repetitive motion injury that manifested itself in 2003 when he felt bad enough that he felt the need to go back to Dr. Collins and get back to him again in July. And so we have a new event, a new injury, and as I said, the respondent had every opportunity to say no, he didn't do overhead work in 2003 or prior to 2003 or after he returned from his surgery in 2001. The only person they could bring in was a lady who was not his supervisor until 2005. Where was his supervisor in 2003 if they're really wanting to say that he wasn't doing overhead work anymore? No, he was doing overhead work. That was his testimony. It was unrebutted, and I believe that's appropriate. In here, we have a commission writing a rather lengthy, detailed decision going over all of the records to show that this is a work-related injury, the records corroborate the man's testimony. This is, the commission in reversing this arbitrator didn't take their duties lightly. They were a long decision. It was detailed, and I believe it spells out everything that would be appropriate for this court to know, to understand why it did what it did, and that what it did was firmly supported by the evidence, particularly not just, and it's not just the testimony of Mr. Sanchez. Even more importantly, the testimony and the records of his treating doctor, Dr. Collins, who repeatedly said, change your work activities, change your work activities, and, well, his work activities didn't really change until at any time until sometime after he was, he was diagnosed with this large, full-thickness tear. Thank you, counsel. Thank you. Rebuttal, please. Thank you, Your Honor. Without trying to beat a dead horse, excuse the expression, on the notice issue, yeah, Mr. Sanchez did testify that he gave, he told Randy, he told Candy, but that was 2005, not 2003. I quoted to you from the section of the arbitration transcript where he said, I told them nothing and Randy wasn't there. Turning next to the argument that Mr. Cohn made that there was changes in Mr. Sanchez's physical condition. Well, yeah, there might have been, but the only evidence my client had when he came back on April 29, 2003, was the same restrictions he had been given in 2000, 2001, and 2002. They weren't aware that there was a change in condition. He didn't testify that he discussed with them what that slit meant. Additionally, they say we brought in no evidence to challenge Mr. Sanchez's credible testimony that there was no overhead work. I think he misunderstood what Ruby Presley was there to talk about. Ruby Presley started out as a packer at PACT. She then became a setup person. She then became a lead person and became a supervisor. She's been there 42 years. She's done every job in the facility. She says there's no overhead work. Mr. Sanchez, by his own testimony, said work was at shoulder level or below. He didn't testify to overhead lifting. And again, his testimony was very contradictory, but how do you pick out what to believe and what not to believe? Is there burden of proof on this case? Not my client's. And I don't believe that the decision of the commission is well supported by the evidence, and we would again request that you reverse their decision, finding that it's against the manifest weight of the evidence. Thank you, counsel, for your arguments. Thank you.